```
                                                          ┌─────────────────────────────────┐
                                                          │ USDC SDNY                       │
                                                          │ DOCUMENT                        │
UNITED STATES DISTRICT COURT                              │ ELECTRONICALLY FILED            │
SOUTHERN DISTRICT OF NEW YORK                             │ DOC #: _____        │
-------------------------------------------------------X  │ DATE FILED:   12/10/2021        │
                                                          └─────────────────────────────────┘
UNITED STATES OF AMERICA
```

     -against-                             20-CR-116 (KMW)

NURRIDDIN WITCHER,                     **OPINION & ORDER**

                    Defendant.

-------------------------------------------------------X

KIMBA M. WOOD, United States District Judge:

On July 26, 2021, a grand jury returned a second superseding indictment of Defendant Nurriddin Witcher, charging him with one count of possessing a handgun while knowing that he had previously been convicted of a felony and was subject to a domestic violence protective order. This superseding indictment was the first to include an allegation that Witcher was a prohibited person based on 18 U.S.C. § 922(g)(8), which prohibits possession of firearms by those subject to domestic violence protective orders, in addition to 18 U.S.C. § 922(g)(1), which prohibits possession of firearms by those who have been convicted of a felony.

Witcher now seeks to dismiss the portion of the indictment alleging a violation of section 922(g)(8). He moves to dismiss under Rule 48(b) of the Federal Rules of Criminal Procedure for undue delay in prosecution and Rule 12 on the ground that the Government's evidence is insufficient as a matter of law. He further argues that section 922(g)(8) impermissibly infringes his Second Amendment rights. In the alternative, he moves under Rule 14 to divide Count One of the indictment into two parts and to hold a separate trial for each subsection of section 922(g) that he is alleged to have violated. For the following reasons, Witcher's motions are DENIED.

**BACKGROUND**

Witcher was indicted in this case for possessing a Glock 22 semi-automatic pistol on December 4, 2019, while knowing he had been convicted previously of a felony and that he was subject to a domestic violence protective order.  (Second Superseding Indictment ("SSI") ¶ 1, ECF No. 49.)  According to the charging complaint, Witcher had been arrested in the Bronx, New York by police officers who had observed him in an altercation with a woman and then saw him drop an object that they later identified as a Glock 22 handgun loaded with ten rounds. (Compl. ¶ 3(e), (g), ECF No. 1.)  Witcher was arrested again on January 29, 2020, presented before federal magistrate court, and detained.  (ECF Nos. 3, 4.)  A grand jury returned an indictment on February 6, 2020 with a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 5.)  After posting bond, Witcher was released on bail February 14, 2020, after which he was subject to home confinement through October 7, 2020 followed by GPS-enforced curfew through June 9, 2021.  (ECF Nos. 11, 26, 48.)

Proceedings in the case were then adjourned several times.  The pretrial conference took place on September 15, 2020 after being adjourned on defense counsel's request to allow time for Witcher to apply for the Young Adult Opportunity Program and then on the Court's own motion to reduce the risk of exposure to COVID-19.  (ECF Nos. 17, 19.)  A bench trial was originally scheduled for October 26, 2020, then adjourned at Witcher's request based on delays in obtaining records from state court.  (ECF No. 30.)  The Government sought and obtained a first superseding indictment, which Witcher moved to dismiss.  (ECF Nos. 34, 40.)  After denying Witcher's motion, the Court scheduled trial for September 20, 2021.  (ECF Nos. 44, 46.)

In July 2021, the Government produced in discovery copies of several protective orders, which restrained Witcher from interacting with his girlfriend or her daughter, and related court

transcripts.  (Decl. of Ian Marcus Amelkin, Exs. F–L, ECF No. 58.)  A grand jury returned a second superseding indictment on July 26, 2021, adding an allegation that Witcher was a prohibited person under 18 U.S.C. § 922(g)(8), due to being subject to domestic violence protective orders when he allegedly possessed the Glock 22.  (SSI ¶ 1.)  Witcher requested an adjournment of trial and filed this motion to dismiss.  (ECF Nos. 50, 56.)

## DISCUSSION

### I.      Rule 48(b) Motion

Witcher moves pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure to dismiss the newly alleged violation of 18 U.S.C. § 922(g)(8) for undue delay in prosecution. Rule 48(b) provides that "[t]he court may dismiss an indictment, information, or complaint if unnecessary delay occurs in . . . presenting a charge to a grand jury."  Fed. R. Crim. P. 48(b)(1). Claims made under this Rule are analyzed as "coterminous" with those made pursuant to the Sixth Amendment's speedy trial clause.  *See United States v. Rucker*, 586 F.2d 899, 907 (2d Cir. 1978); *United States v. Infanti*, 474 F.2d 522, 527 (2d Cir. 1973).  The Court thus applies the speedy trial balancing test set forth by the U.S. Supreme Court in *Barker v. Wingo*, which entails consideration of "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  407 U.S. 514, 530 (1972).  When weighing a motion to dismiss for undue delay in prosecution, a court must be mindful to apply the "proper caution in exercising this extraordinary power where laws and rules specifically designed to prevent pretrial delay [such as . . . the Speedy Trial Act] do not require dismissal."  *United States v. Paredes-Batista*, 140 F.3d 367, 376 (2d Cir. 1998) (internal quotation marks omitted, brackets in original).

Each of the four factors weighs against granting Witcher's motion to dismiss.  Turning to

the first factor, sixteen months passed between Witcher's arrest on the charge in the Complaint in

January 29, 2020[1] and the grand jury's return of the second superseding indictment on July 26,

2021.  This duration exceeds the one year that typically justifies beginning an inquiry into the

appropriateness of delay in the Government's prosecution.  *See Doggett v. United States*, 505

U.S. 647, 652 n.1 (1992).  But the factor does not weigh in Witcher's favor.  Sixteen months is

shorter than the delay between arrest and indictment in cases in which courts have found no

undue delay in prosecution.  *See, e.g.*, *Infanti*, 474 F.2d at 527 ("[T]he length of time from arrest

to indictment was 21 months and from arrest to trial 28 months, neither extraordinary."); *Holmes*

*v. Bartlett*, 810 F. Supp. 550, 562 (S.D.N.Y. 1993) (Edelstein, J.) (remarking that "eighteen

months [from arrest to arraignment], was considerably shorter than the delays in other cases

where courts found no [speedy trial] violation"); *see also United States v. Reichberg*, No. 1:16-

CR-468-GHW, 2018 WL 6599465, at *13 (S.D.N.Y. Dec. 14, 2018) (Woods, J.) (surveying

cases in which trial took place between seventeen months and six years after arrest without a

violation of the speedy trial right).

The second factor, reasons for the delay, similarly weighs against Witcher.  The United

States government declared the COVID-19 pandemic a public health emergency just five days

after Witcher's arrest.  *See Determination that a Public Health Emergency Exists*, U.S. Dep't of

Health & Human Servs. (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/

phe/Pages/2019-nCoV.aspx.  One need not recount all of the ongoing, society-wide disruptions

from the COVID-19 pandemic to recognize that few, if any, aspects of life in the United States

have been unaffected.  Most pertinently, the pandemic sharply constrained the operation of state

---

[1] The January 2020 arrest is the arrest relevant to speedy trial determinations.  *See, e.g.*, *United States v. Stewart*, No. 2:18-CR-00030-1, 2019 WL 6173775, at *10 (D. Vt. Nov. 20, 2019), *aff'd*, No. 20-1678-CR, 2021 WL 1621599 (2d Cir. Apr. 27, 2021) (holding that Rule 48(b) did not apply to an initial arrest from which the defendant was released without being federally charged or indicted).

and federal courts.  Defense counsel noted delays approaching one year in obtaining court

records relevant to this case, due to disruptions to New York state courts.  (ECF No. 29.)  The

Government was also naturally constrained by these delays, as it had to obtain the relevant court

records before seeking an indictment for a violation of section 922(g)(8).  The disruptions caused

by the COVID-19 pandemic are "valid reason[s]" that "justify appropriate delay" in prosecution

that should not be held against the Government.  *Barker*, 407 U.S. at 531; *see United States v.*

*Arthur*, No. 17-CR-253-PWG-4, 2020 WL 3073322, at *7 (D. Md. June 10, 2020) ("The delay

caused by exigent circumstances created by the COVID-19 pandemic cannot be weighed against

the Government.").  Even if some delay cannot be attributed to pandemic-related disruptions, the

Government is not obligated to bring a charge immediately upon obtaining potentially sufficient

evidence, given the desirability of avoiding unwarranted prosecutions and allowing the exercise

of prosecutorial discretion.  *See United States v. Lovasco*, 431 U.S. 783, 793–94 (1977).  Here,

there is no indication of "deliberate attempt[s] to delay the trial in order to hamper the defense,"

or even of "more neutral reason[s] such as negligence" that would weigh slightly against the

Government.  *Barker*, 407 U.S. at 531.

The third factor is a defendant's invocation of his speedy trial right, which weighs

strongly against Witcher's motion.  The motion before the Court is the first instance of Witcher

invoking his right to a speedy trial in this case.  His prior communications to the Court relating to

the speed of proceedings were to request repeated adjournments and to give consent to

exclusions of time under the Speedy Trial Act.  (*See, e.g.*, ECF Nos. 12, 16, 29, 32.)  The

Supreme Court has placed significant weight on this type of failure to invoke one's speedy trial

right earlier in litigation.  "The more serious the deprivation, the more likely a defendant is to

complain," and thus, "failure to assert the right will make it difficult for a defendant to prove that

he was denied a speedy trial." *Barker*, 407 U.S. at 531–32.

The fourth factor is the most serious: prejudice to the defendant because of delay.  A reviewing court will assess prejudice "in the light of the interests of defendants which the speedy trial right was designed to protect . . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532.  None of these interests favors dismissal.  Witcher was incarcerated for seventeen days and was released long before the most recent superseding indictment led to a postponement of the September 2021 trial date.  Also limited are the anxiety and stress that Witcher assertedly experienced due to his bail conditions and the uncertainty surrounding his case.  The bail conditions of which Witcher complains were lifted before the second superseding indictment was filed.  (*See* ECF No. 48.)  Even while in place, they were analogous to conditions that the Second Circuit has held "do not demonstrate more than minimal prejudice." *United States v. Nieves*, 648 Fed. App'x 152, 155 (2d Cir. 2016) (summary order). Finally, it is not clear that the defense will be prejudiced if witnesses have diminished memories regarding signs of whether Witcher knew in December 2019 that he was subject to a protective order.  In fact, "because the government bears the burden of proof . . . [f]ading memories often 'work to the accused's advantage.'" *United States v. Moreno*, 789 F.3d 72, 81 (2d Cir. 2015) (quoting *Barker*, 407 U.S. at 521).  Taken as a whole, Witcher provides scant reason to think that he has been significantly prejudiced by the months between his arrest and the second superseding indictment.  As all four of the *Barker* factors weigh against Witcher, his motion to dismiss under Rule 48(b) is denied.

## II.    Sufficiency of the Evidence

Next, Witcher moves to dismiss the indictment because "as a matter of law, the government cannot make out a violation of § 922(g)(8)." (Mem. at 1, ECF No. 57.)  He

contends that the Government will not be able to prove two elements of section 922(g)(8) beyond a reasonable doubt—that his protective orders were issued after hearings of which he had actual notice and an opportunity to participate, and that the orders by their terms explicitly prohibit using physical force against an intimate partner or child.  Because he does not point to any such flaws on the face of the indictment, Witcher's motion is a premature sufficiency-of-the-evidence argument that is properly raised no earlier than trial.  *See* Fed. R. Crim. P. 29(a), (c). The general rule is that "a court cannot test the sufficiency of the government's evidence on a Rule 12(b) motion" before trial.  *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018). The Second Circuit has historically employed an "extraordinarily narrow" exception to this rule, but it does not apply in this case: the government "cannot 'fairly' be said to have made 'a full proffer of the evidence it intends to present at trial.'"  *Id.* at 282–83 (quoting *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998)).[2]

### III.    Constitutionality of 18 U.S.C. § 922(g)(8)

Witcher also asserts that section 922(g)(8) is an impermissible infringement upon his rights under the Second Amendment of the U.S. Constitution.  He argues that the statute as applied to him is insufficiently tailored to the government's interest in preventing domestic violence because the qualifying protective order was issued without Witcher having been convicted of any crime, much less one involving a firearm or domestic violence.  (Mem. at 20–21; Reply at 6, ECF No. 63.)[3]  Because the statute applies only after a court imposes a protective order premised on the danger that a person poses to an intimate partner or child, Witcher's

---

[2] The Circuit has noted that recent Supreme Court jurisprudence "may cast doubt on the continued viability of even this narrow exception," but has not resolved whether the exception persists.  *Sampson*, 898 at 282 n.10.

[3] Witcher styles his attack on the constitutionality of section 922(g)(8) as both a facial and as-applied challenge. (Mem. at 18.)  Because the statute is valid as applied to Witcher, the Court need not conduct a separate, facial analysis that would inquire whether "no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

challenge fails.

Over the past decade, the Second Circuit has built a framework for adjudicating asserted violations of individuals' Second Amendment rights. The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The U.S. Supreme Court announced in 2008 that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), and incorporated that right against the states two years later, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The Second Circuit has since articulated a two-step inquiry to adjudicate whether a statute violates an individual's Second Amendment rights: "First, 'we must determine whether the challenged legislation impinges upon conduct protected by the Second Amendment.' Second, if we find that a law implicates the Second Amendment as *Heller* instructed us to interpret it, we determine the appropriate level of scrutiny to apply and evaluate the constitutionality of the law using that level of scrutiny." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254–55 (2d Cir. 2015) ("*NYSRPA*").

### A. Whether the Statute Implicates the Second Amendment

At the first step of this inquiry, Second Circuit panels have considered two conceptually distinct conditions, both of which are at least presumptively satisfied in this case. First of these is that the litigant is among "the people" to whom the Second Amendment right applies. While some circuits have excluded from this protected group people who are not law-abiding or who are not otherwise "virtuous," our circuit has not yet resolved the boundary of this group. *See Jimenez*, 895 F.3d at 233–34. Circuit law instructs the Court to assume that a litigant is protected by the Second Amendment—and not to wade into the difficult task of defining precisely who

does or does not qualify for the Second Amendment's protections unless a statute would fail the

relevant level of scrutiny. *See id.* The Court thus assumes for now that Witcher is protected by

the Second Amendment.

The second condition is that the conduct restricted by the statute falls within the scope of

the amendment's protections. *Heller* noted "important limitation[s] on the right to keep and

carry arms," which protects the sorts of weapons that (1) were "in common use at the time" of

the amendment's ratification and (2) are "typically possessed by law-abiding citizens for lawful

purposes." *Heller*, 554 U.S. at 625, 627 (2008) (internal quotation marks omitted); *see NYSRPA*,

804 F.3d at 254–55. Because the statute in question prohibited Witcher from possessing a

handgun for defense in the home—the type of weapon and use deemed critical by *Heller*, 554

U.S. at 629—this second condition is also satisfied.

**B. Determining and Applying the Appropriate Level of Scrutiny**

The second step of the Second Circuit's inquiry entails determination of the proper level

of scrutiny and evaluation of the challenged regulation under the appropriate constitutional test.

Once again, there are two component parts to this process: "We determine whether a restriction

on firearms is examined under strict or intermediate scrutiny based on two factors: '(1) how

close the law comes to the core of the Second Amendment right and (2) the severity of the law's

burden on the right.'" *United States v. Perez*, 6 F.4th 448, 454 (2d Cir. 2021) (quoting *NYSRPA*,

804 F.3d at 258). A strong showing on both factors is necessary to trigger strict scrutiny—

intermediate scrutiny will be applied if a statute either restricts "conduct outside the core of the

Second Amendment" or imposes an "insubstantial burden[]" on core conduct. *Jimenez*, 895 F.3d

at 234.

Section 922(g)(8)'s restrictions fall outside of the core of the Second Amendment right.

"*Heller* identified as at the core of the Second Amendment 'the right of law-abiding, responsible

citizens to use arms' in self-defense in the home." *Perez*, 6 F.4th at 454 (quoting *Heller*, 554

U.S. at 635).  This core is defined "by reference not only to particular *uses* and particular

*weapons* but also to particular *persons*, namely, those who are 'law-abiding and responsible.'"

*Jimenez*, 895 F.3d at 234–35 (emphases added).  Witcher's history of law violations and the

significant danger that a judge determined he posed to an intimate partner and child remove him

from the "law-abiding and responsible" persons whose home defense is at the core of the Second

Amendment.  Individuals who pose a serious danger of domestic violence are of a kind with

those covered by "longstanding prohibitions on the possession of firearms by felons and the

mentally ill"—examples of regulations *Heller* highlighted as "presumptively lawful" under its

reasoning.  *Heller*, 554 U.S. at 626–27 & n.26; *see also Jimenez*, 895 F.3d at 237 (discussing

section 922(g)'s application to "special risk groups . . . who had demonstrated an inability or

unwillingness to take others' safety into account, or otherwise might be especially dangerous

with a gun").  Because section 922(g)(8) does not burden the core of the Second Amendment

right, intermediate scrutiny applies despite the burden being severe due to the statute's tough

criminal penalties of up to ten years of imprisonment.  *See* 18 U.S.C. § 924(a)(2).

The statute satisfies intermediate scrutiny because it is "substantially related to the

achievement of an important governmental interest."  *Kachalsky v. Cnty. of Westchester*, 701

F.3d 81, 96 (2d Cir. 2012).  The government has two sufficient interests.  The interest in public

safety is not just important, but "compelling" and "paramount."  *Jimenez*, 895 F.3d at 236.  More

particular to the facts of this case, preventing domestic violence is also at least an important

government interest.  *See Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 360 (2d Cir. 2021); *see also*

*United States v. Erwin*, No. 1:07-CR-556 LEK, 2008 WL 4534058, at *2 (N.D.N.Y. Oct. 6,

2008) ("Reducing domestic violence is a compelling government interest[.]").

The temporary restrictions on gun possession imposed by section 922(g)(8) are substantially related to reducing domestic violence and promoting public safety. The connection between gun possession and increased risk of domestic violence is significant: "[M]ore intimate-partner homicides have been committed with firearms than with all other weapons combined over the past 25 years. In States that require individuals subject to restraining orders to relinquish firearms, intimate partner-homicide rates were fourteen percent lower than in States that did not have such requirements." *Torcivia*, 17 F.4th at 359. These links have been considered significant by the circuit courts that have considered Second Amendment challenges against section 922(g)(8)—and that have unanimously upheld the law. *See, e.g.*, *United States v. Mahin*, 668 F.3d 119, 128 (4th Cir. 2012) ("[Section] 922(g)(8) rests on an established link between domestic abuse, recidivism, and gun violence[.]"). Unlike the blanket prohibition on handgun ownership overturned in *Heller*, this regulation is closely tailored to the link between gun possession and domestic violence. The restrictions are temporary, individualized, and subject to procedural protections applying only while a person is under a qualifying protective order that was issued at a hearing of which he had actual notice and an opportunity to object and explain why he is not a danger. A law tailored so granularly to such an important interest easily satisfies intermediate scrutiny.[4]

## IV.    Severance

Finally, Witcher moves pursuant to Rule 14 for the Court to sever the single count of the second superseding indictment into two and to hold a separate trial for each theory of how

---

[4] Given ongoing judicial ferment regarding the Second Amendment right, it bears noting that several district courts considered constitutional challenges to section 922(g)(8) in 2008 and 2009, before their circuit courts had articulated a test for determining the level of scrutiny to apply to firearm regulations. Courts in this circuit and elsewhere persuasively reasoned that 922(g)(8) would easily satisfy strict scrutiny, thereby obviating the need to resolve which level of scrutiny would be appropriate. *See, e.g.*, *Erwin*, 2008 WL 4534058, at *2 n.2; *United States v. Luedtke*, 589 F. Supp. 2d 1018, 1025 (E.D. Wis. 2008).

11

Witcher was a prohibited person under section 922(g).  Under Rule 14, the court may, in its discretion, divide multiple offenses or multiple defendants into separate trials to avoid substantial prejudice to a party.  *See* Fed. R. Crim. P. 14(a).  Severance in this case would be inappropriate for two reasons.  One, Witcher provides no examples of a court severing a *single* offense into two trials.  The many circuit courts that have considered the issue have determined that whether a defendant "is a member of one of the disqualifying classes [under section 922(g)] or of all nine, a single act of possession can only constitute a single offense."  *United States v. Dunford*, 148 F.3d 385, 388 (4th Cir. 1998); *see United States v. Platter*, 514 F.3d 782, 785 (8th Cir. 2008). Even if holding two trials for this single offense did not raise problems of multiplicity, doing so would run counter to the goals of economy and efficiency that Rule 14 is intended to further. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993).  Two, Witcher provides no credible argument that a single trial would subject him to substantial prejudice—certainly not of the type that could not be cured with less radical measures, such as limiting jury instructions.  *See United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011).

## CONCLUSION

For the foregoing reasons, Witcher's motion to dismiss the indictment is DENIED.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 56 and all other pending motions in this case.

SO ORDERED.

Dated: New York, New York
       December 10, 2021                                    */s/ Kimba M. Wood*
                                                       KIMBA M. WOOD
                                                 United States District Judge